IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SGI, Inc., *et al.*, | : | Case No. 1:25-cv-99 |
| | : | |
| Petitioners, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | Order Denying Motion to Vacate |
| | : | Arbitration Award and Confirming the |
| Sheakley HR Acquisition, LLC, | : | Final Partial Award and Final Award |
| | : | |
| Respondent. | : | |

This matter is before the Court on Sheakley HR Acquisition, LLC's ("Sheakley") Motion to Vacate Arbitration Award and Memorandum in Opposition to the Application to Confirm Arbitration Award and subsequent Motion to Vacate Final Arbitration Award (together, the "Motion to Vacate"). (Docs. 19, 23.) SGI, Inc., Matthew Sheakley, and Thomas Pappas, Jr. responded in opposition (Doc. 20), to which Sheakley replied. (Doc. 21.) For the reasons that follow, Sheakley's Motion to Vacate will be **DENIED**, and the Court will **CONFIRM** the Final Partial Award and Final Award.

I. **BACKGROUND**

A. **Security Purchase Agreement**

On August 17, 2021, SGI, Inc., Matthew A. Sheakley, and Thomas E. Pappas, Jr. (collectively, "SGI") and Sheakley Managed Services, LLC ("Sheakley") entered into a Securities Purchase Agreement ("SPA") with an Effective Date of July 31, 2021. (Doc. 1-2 at PageID 41.) Under the SPA, the Sellers[1] (SGI) sold, transferred, conveyed, assigned and delivered to Buyer[2] (Sheakley) one hundred percent of all of the Equity Interests of the Company Group (Sheakley HR, LLC and Sheakley Managed Services, LLC) held by each Seller, or the

---

[1] "Sellers" are defined as SGI, Inc., Matthew A. Sheakley, and Thomas E. Pappas, Jr. (Doc. 1-2 at PageID 41.)
[2] "Buyer" is defined as Sheakley HR Acquisition, LLC. (Doc. 1-2 at PageID 41.)

Acquired Interests.[3] (*Id.*) Section 2.3 set forth the Purchase Price for the Acquired Interests, which included a potential "adjustment amount (if any) as determined in accordance with Section 6.6" of the SPA. (*Id*. at PageID 51.) Section 2.3 states:

> Section 2.3  Purchase Price.  The aggregate consideration for the Acquired Interests, the assignment of the SIWC Policy and the other related rights and benefits conferred herein (the "Purchase Price") shall be an amount (subject to adjustment and set off as set forth in this Agreement) equal to the sum of (i) $32,215,632.00 (the "Base Purchase Price"), plus (ii) an aggregate amount equal to $5,685,112.00 (the "Installment Amount"), which shall be payable in thirty-six (36) equal monthly installments beginning on the date which is four (4) months after the Closing Date (each such payment, an "Installment Payment"), which shall be unsecured and subject to adjustment and set off as set forth in this Agreement, plus or minus (iii) any adjustment amount as determined in accordance with Section 2.6, and minus (iv) any adjustment amount (if any) as determined in accordance with Section 6.6.  The Purchase Price shall be payable to the Sellers in accordance with their respective Pro Rata Shares.

(*Id.*) (emphases in original).  At issue in this case is the "adjustment amount (if any)" under Section 6.6, which is defined as follows:

> Section 6.6  Payment Obligations.  Buyer and Sellers agree that, if in the 365-day period beginning on the Effective Date (the "Post-Closing Adjustment Start Date") and ending on the 365th day following the Post-Closing Adjustment Start Date (the "Post-Closing Adjustment Termination Date"), the aggregate Gross Profit realized from the revenue-producing agreements with customers of the Company Group in effect as of the Effective Date and with customers from all New Contracts (the "Post-Closing Gross Profit") is less than one hundred percent (100%) of $13,724,449 (the "Baseline Gross Profit"), the Purchase Price payable hereunder shall be reduced by a percentage equal to the difference between (i) one hundred percent (100%) and (ii) the percentage that results when the Post-Closing Gross Profit is divided by the Baseline Gross Profit (the total dollar amount of such reduction, the "Gross Profit Purchase Price Reduction").  Within sixty (60) calendar days after the Post-Closing Adjustment Termination Date, Buyer will deliver to the Sellers a statement (the "Gross Profit Statement") setting forth Buyer's calculation of the Post-Closing Gross Profit, its calculation of the Gross Profit Purchase Price Reduction, if any, and commercially reasonable documentation supporting its calculation thereof.  Any dispute with respect to the Gross Profit Statement shall be resolved in accordance with Section 2.6(b), *mutatis mutandis*.  The Gross Profit Purchase Price Reduction, as finally

---

[3] "Company Group" is defined by the SPA as Sheakley HR, LLC, an Ohio limited liability company ("Company") and Sheakley Managed Services, LLC, an Ohio limited liability company ("SMS" and together with the Company and each of their respective Company Subsidiaries, the "Company Group").  (Doc. 1-2 at PageID 41.)

> determined under this Agreement, shall be satisfied by offset against the next payable Installment Payment and, to the extent the amount of the Gross Profit Purchase Price Reduction exceeds the amount of the next payable Installment Payment, by offset against each succeeding Installment Payment thereafter, applying the remaining amount of the Gross Profit Purchase Price Reduction against the full amount of each Installment Payment next payable in the sequence of Installment Payments, and then proceeding, to the extent of any remaining amount of the Gross Profit Purchase Price Reduction, to offset them against the full amount of the next payable Installment Payment in the sequence, and repeating this procedure thereafter until the entire Gross Profit Purchase Price Reduction has been satisfied or there are no remaining Installment Payments to setoff against. For the avoidance of doubt, the Parties agree that Buyer shall be permitted to cause the Company Group to conduct its business and the Acquired Business after the Closing based on the business judgment of Buyer and its authorized Agents; provided, however, that Buyer shall not take any actions, or omit to take any actions, in bad faith with the specific intent and purpose of causing a Gross Profit Purchase Price Reduction under this Section 6.6 to occur.

(Doc. 1-2 at PageID 81.)

### C. Sheakley Submits a Request for a Gross Profit Purchase Price Reduction

On March 16, 2023, Sheakley sought a Gross Profit Purchase Price Reduction under the SPA due to underperformance of the Company Group purchased through the SPA. (Doc. 1-1 at PageID 10; Doc. 17-39 at PageID 2813–16.) But SGI rejected the request as untimely. (Doc. 1-1 at PageID 10.) SGI relies upon the following 60-day timeline for its position that SGI was required to submit a Gross Profit Statement setting forth its calculation of a Gross Profit Purchase Price Reduction by September 29, 2022, and Sheakley missed that deadline by months:

> Within sixty (60) calendar days after the Post-Closing Adjustment Termination Date, Buyer will deliver to the Sellers a statement (the "Gross Profit Statement") setting forth Buyer's calculation of the Post-Closing Gross Profit, its calculation of the Gross Profit Purchase Price Reduction, if any, and commercially reasonable documentation supporting its calculation thereof.

(Doc. 1-2 at PageID 81.) SGI alternately asserts that Sheakley failed to submit commercially reasonable documentation supporting its calculation of a Gross Profit Purchase Price Reduction. Sheakley, on the other hand, maintains that it delivered the Gross Profit Statement after receiving

3

a necessary analysis from a third-party, Merlinos and Associates, Inc. ("Merlinos"), and never waived its right to a Gross Profit Purchase Price Reduction. (Doc. 1-1 at PageID 10.)

**D. Procedural History**

Unable to resolve their dispute, SGI filed a Demand for Arbitration with an American Arbitration Association ("AAA") arbitration panel in the matter of *SGI, Inc., et al. and Sheakley HR Acquisition, LLC*, AAA Case No. 01-23-0002-7450, followed by an Amended Demand, seeking recovering of $3,300,732.00, the balance of Installment Payments it claims is due under the SPA which have not been paid to it by Sheakley, together with interest. (Doc. 1 at PageID 1; Doc. 1-1.) On May 8, 2024, Sheakley served an Amended Answer and Counterclaim asserting: declaratory judgment that it is entitled to repayment of the Gross Profit Purchase Price Reduction under Section 6.6 of the SPA; breach of contract; and breach of the implied covenant of good faith and fair dealing. (Doc. 1-1 at PageID 11.) Sheakley contends that it overpaid SGI by $6,456,698.39 and is entitled to a refund or return of the outstanding amount under the SPA. (*Id.*)

On February 14, 2025, the arbitration panel issued a Final Partial Award in favor of SGI on a Majority basis (the "Majority"), with two arbitrators out of three in agreement. (Doc. 1-1.) The Majority granted SGI's Motion for Summary Judgment/Disposition and ruled that SGI is entitled to the recovery of unpaid Installment Payments due from Sheakley totaling $3,300,732.00. (*Id*. at PageID 22–23.) The Majority issued a Final Award on April 10, 2025, which awarded to SGI fees, costs, and interest for a total award of $3,543,384.40. (Docs. 9, 9-1.)

On February 18, 2025, SGI filed this action to confirm the Final Partial Award under 9 U.S.C. § 9. (Doc. 1.) On April 11, 2025, SGI filed a Supplemental Application to Confirm Arbitration Award to include the Final Award. (Docs. 9, 9-1.) On May 15, 2025, Sheakley filed

4

a Motion to Vacate the Arbitration Award and Memorandum in Opposition to Application to Confirm the Arbitration Award.[4] (Doc. 19.) SGI responded in opposition (Doc. 20), and Sheakley replied. (Doc. 21.) Sheakley then filed a Motion to Vacate Final Arbitration Award and Memorandum in Opposition to Application to Confirm Arbitration Award on July 9, 2025 "out of an abundance of caution" to clarify that its challenge includes the Final Partial Award and the Final Award. (Doc. 23.) Because this Court finds no grounds to do vacate the Final Partial Award and Final Award under 9 U.S.C. § 9, Sheakley's Motion to Vacate (Docs. 19, 23) will be **DENIED**.

## II. STANDARD OF LAW

The Federal Arbitration Act ("FAA") expresses a "federal policy favoring arbitration." *Samaan v. Gen. Dynamics Land Sys., Inc.,* 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Id*. (quoting *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 305 (6th Cir. 2008) (brackets and citation omitted)). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error." *Id*. (quoting *Solvay Pharm., Inc. v. Duramed Pharm., Inc.*, 442 F.3d 471, 476 (6th Cir. 2006) (brackets, citation, and emphasis omitted)).

"On application of one of the parties, a district court possessing a basis for subject-matter jurisdiction independent of the FAA must issue an order confirming an arbitrator's award 'unless the award is vacated, modified, or corrected as prescribed in' 9 U.S.C. §§ 10 and 11." *Id*. (quoting 9 U.S.C. § 9). An arbitration award can be vacated under the FAA under four limited

---

[4] Due to filing issues, Sheakley's original Motion was filed in April 2025 but had to be refiled but remain pending on the docket. Thus, the prior versions of its Motion (Docs. 10, 13) are **DENIED AS MOOT**.

circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id*. (quoting 9 U.S.C. § 10(a)); *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding that the statutory grounds enumerated in § 10 are the exclusive means under the FAA to vacate an arbitrator's award); *Grain v. Trinity Health, Mercy Health Servs. Inc.*, 551 F.3d 374, 378 (6th Cir. 2008) (same).

As an alternative to these statutorily created bases for vacatur, the Sixth Circuit has recognized a judicially created basis for vacatur of an arbitration award where it was made in "manifest disregard of the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995). Whether the "manifest disregard" standard applies is an open question after the Supreme Court's ruling in *Hall Street*, which recognized that the statutory grounds enumerated in § 10 of the FAA are the exclusive means to vacate an arbitrator's award. 552 U.S. at 584; *Samaan*, 835 F.3d at 600 (declining to resolve the open question and analyzing vacatur under the FAA). An arbitrator "does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Merrill Lynch*, 70 F.3d at 421. An arbitrator's "mere error in interpretation or application of the law is insufficient" to satisfy this "very narrow standard of review." *Id*.

6

### III. ANALYSIS

#### A. Sheakley's Arguments

Sheakley argues that the Majority manifestly disregarded controlling Delaware law[5] for three reasons:

1. The SPA is silent and ambiguous as to the implications for Sheakley's being unable to comply with the 60-day window because third party analysis from Merlinos was not available.
2. The Majority acknowledged that the SPA did not contain a "time is of the essence" clause but enforced the 60-day time period as if it did.
3. The Majority found that Sheakley waived or forfeited its ability to claim the Gross Profit Purchase Price Reduction.

(Doc. 19 at PageID 2974; 2977; 2980.) The Court will address these three arguments in turn in, but none of them carry the day.

#### B. Ambiguity and Silence

Sheakley argues that the SPA is ambiguous and silent, and the Majority disregarded the law in finding it not to be so. Specifically, Sheakley contends that Section 6.6 of the SPA is ambiguous because a different contract provision, Section 6.13(b) providing for a third party, Merlinos, to provide a post-closing actuarial report, conflicts. Sheakley also argues the SPA is silent as to what to do if Merlinos fails to provide its necessary analysis in time. Sheakley argues that the Majority should therefore have considered extrinsic evidence in interpreting the parties' SPA. Under Delaware law, "[i]f a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But where there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms." *Eagle Indust., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (De.

---

[5] There is no dispute that Delaware law was designated as the controlling law, as set forth in Section 8.9 of the SPA. (Doc. 1-2 at PageID 94.)

1997). *See also Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, No. CV 8520-VCG, 2017 WL 1191061, at *19 (Del. Ch. Ct. Mar. 30, 2017) (a court may use extrinsic evidence where there is ambiguity or contractual silence on an issue).

The Majority found the contract to be unambiguous. It considered and rejected Sheakley's position as a straight-forward matter of contract interpretation. (Doc. 1-1 at PageID 13–17.) The Majority found:

> A critical aspect of the dispute in this arbitration is whether the "sixty (60) calendar days" timeframe within which Sheakley "will deliver" the Gross Profit Statement to SGI constitutes a "deadline" for that delivery, as SGI contends, or a "window" within which time the parties will or may begin communications with each other respecting a Purchase Price Reduction (assuming the necessary conditions have occurred), as Sheakley contends. The verb "will" as quoted in this section contrasts with the verb "shall" that appears elsewhere in the section; Sheakley contends that this supports its argument that the time of delivery being within that sixty-day period is not mandatory (*i.e.*, not a "deadline" for Sheakley's performance). However, by its terms, § 6.6 provides for delivery of a Gross Profit Statement that would support a Gross Profit Purchase Price Reduction, "*if any*". That is, it recognizes that, perhaps, no such reduction would be warranted under the contract terms and therefore that no delivery of a Gross Profit Statement might be necessary at all (in this respect, see also SPA § 2.3). Since it would not be certain that any such Statement would be sent, the verb "*will* deliver" (contrasted with "shall") is contingent on whether or not the Buyer would be pursuing a purchase price reduction; this construction, however, does not make any less enforceable the *timeframe* for doing so, in the event that the Buyer choose to seek an optional contractual benefit.

(Doc. 1-1 at PageID 12) (emphasis in original). Thus, the "Majority concludes that the expectations of an 'ordinary buyer and an ordinary seller' would be that a Gross Profit Statement would be delivered by Sheakley to SGI within sixty calendar days after the Post-Closing Termination Date, if Sheakley actually intended that any such Gross Profit Statement was going to be provided respecting a purchase price reduction." (*Id.*) The Majority also determined that SGI had a right to know whether it had further obligation to pay a claimed purchase price reduction. (*Id.*) "This awareness within the stated period was unambiguously specified right

8

expressly set out in the SPA." (*Id*.) The Majority, thus, rejected Sheakley's argument that the parties intended the 60-day window to function as a procedural mechanism to facilitate exchange of information and an agreement on the Purchase Price Reduction, finding "this interpretation to be contrary to the clear meaning of the words in the SPA, and out of context for the actions to be performed thereunder." (*Id*. at PageID 13.)

The Majority also rejected Sheakley's argument that there was a condition to the delivery of the Gross Profit Statement being the prior receipt of a final report of the actuarial consulting firm, Merlinos. The Majority noted that no evidence was presented of any effort made by Sheakley in any timely manner to obtain the Merlinos report, or data underlying it, for purposes of preparing a Gross Profit Statement. (*Id*. at PageID 14.) The Majority also rejected the Dissenting opinion's position that Section 6.13(e) conflicts with Section 6.6 of the SPA:

> The dissenting opinion notes that, per SPA § 6.13(e), the "Annual WC Consultant Report" was to be delivered "within thirty (30) days of each Year End Report Effective Date." While that is correct, this highlights the different view respectfully taken by the Majority: "Annual WC Consultant Report" is a defined term applicable to § 6.13(e); this can be contrasted with § 6.13(b) where a different defined term ["WC Consultant Report"] applied to a pre-closing study that was also to be performed by Merlinos. The § 6.13(e) definition is specifically a year-end report, and the § 6.13(b) definition relates to a report performed prior to closing and when arranged by the parties. Critically, however, the "Gross Profit" definition (pertinent to § 6.6) does **not** incorporate or use the "annual" or "year-end" terms but merely refers to claim development "as determined by the WC Consultant" (i.e., more akin to the 6.13(b) definition than the § 6.13(e) definition, especially when the established 60-day period is taken into account.[)] The parties understood that a WC report on loss development could be obtained as at year-end, but that was not the only or exclusive way that such information could be obtained.

(*Id.* at PageID 17) (emphasis in original). Thus, although Sheakley disagrees with the Majority's interpretation, the Majority found the language to be unambiguous.

Sheakley also argues it was in disregard of the law for the Majority to consider evidence about the parties' dealings or discuss what curative actions Sheakley might have taken when it

9

found the contract to be unambiguous. Because the Majority found the contract to be unambiguous, the Court views those considerations to be in the alternative (that is, if the Majority found the contract to be ambiguous, the evidence did not support Sheakley's position) and/or dicta. The Majority could also consider extrinsic evidence to determine whether the contract was silent on the issue of the Merlinos report. Nonetheless, the Court does not read the Final Partial Award as the Majority having considered extrinsic evidence to conclude that the SPA is unambiguous. The Court need not consider the alternative arguments regarding the parties' conduct as the contract was found to be unambiguous.

### C. Reasonable Time to Perform

Sheakley argues that even if the SPA is unambiguous as to Section 6.6's 60-day timeframe, Delaware law permits the parties a "reasonable time" to perform unless a contract includes a "time is of the essence" clause. *See Osborn v. Kemp*, 991 A.2d 1153, 1161 (Del. 2010) (finding 90 days to be a reasonable time period to exercise an option to buy real property where real estate contract did not include a "time is of the essence" clause); *HIFN, Inc. v. Intel Corp.*, No. Civ. A. 1835-VCS, 2007 WL 1309376, at *11 (Del. Ch. Ct. May 2, 2007). *See also J.A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540, 550 (Del. Sup. 1977) (finding year-and-a-half delay to be unreasonable). Whether a party to a contract performed within a reasonable time is ordinarily a question of fact and thus generally inappropriate for summary judgment. *HIFN, Inc.*, 2007 WL 1309376, at *11. However, courts in Delaware have recognized that a reasonableness inquiry can be decided on summary judgment in appropriate cases by determining whether the burden has been satisfied that a rational trier of fact could conclude that it performed within a reasonable time. *Id*. Sheakley argues that because there was no "time is of the essence" clause, the Majority should have considered whether it submitted its Gross Profit

Statement in a commercially reasonable time, which is a question of fact.

The Majority considered and distinguished Delaware law regarding "time is of the essence" clauses. (*See* Doc. 1-1 at PageID 20–22.) As to *Osborn*, it noted that the contract in that case was 32 words in its entirety and did not set out any timeframe within which the purchaser must obtain financing for purchase of real property, the timeframe in question. (Doc. 1-1 at PageID 20.) The Majority also highlighted that the *Osborn* court noted another Delaware principle of law, which is that a contract's construction should be that which would be understood by an objective, reasonable third party and that when a contract is clear and ambiguous, the law gives effect the plain-meaning of the contract's terms and provisions. (*Id*.) In this case, the contractual milestones address the obligation of Sheakley to make installment payments totaling $5.7 million and the option to seek a benefit, a potential price reduction, which is not an obligation. (*Id*.) The Majority determined that "Sheakley's right to potentially seek a price reduction if it qualified for one by following clearly prescribed steps and submitting proof and a calculation. Any obligation to reduce the price could only follow a submission of the Statement followed by proof that an adjustment downward in the price was warranted." (*Id*.)

The Majority also distinguished cases discussing that even when a delivery time is set forth in a contract, without time being of the essence, reasonable compliance is in accord with industry standards. (*Id*. at PageID 21.) The Majority considered *J.A. Jones* and distinguished it on multiple grounds, including that statutory implications of the Uniform Commercial Code ("UCC") are inapplicable in this case, and other principles more pertinent than an absence of the time is of the essence clause, including that contract language will not suffice to relieve a contracting party of its failure to satisfy legal obligations unless the contract language makes it clear and unequivocal that the parties specifically contemplated that in the contracting party

11

would be relieved of its own defaults. (*Id.* at PageID 21.) It found that nothing in the SPA clearly or unequivocally relieved Sheakley of its obligation to comply with § 6.6, if it were going to assert a right to purchase price reduction at all. (*Id.*) And the Majority considered *HIFN, Inc.*, where dates were "targets" and not rigid dates, and there was no time is of the essence clause. (*Id.*) The Court found that HIFN failed to perform within a reasonable time and thus committed a total breach of contract on that basis. (*Id.*)

In sum, the Majority considered the arguments raised by Sheakley. The Majority acknowledged that there was no "time is of the essence" clause, but the SPA included explicit milestones for performance or delivery of essential documents it found controlling:

> [T]he parties allocated via clear and unambiguous language, the obligation solely *to Sheakley* to deliver a Gross Profit Statement to SGI within the sixty-day period if it would choose to seek a purchase price reduction under SPA § 6.6 There was no obligation or duty on either party for there to be a price reduction; that was an option possessed solely by Sheakley and there were conditions – both temporal and content – in order for Sheakley to seek any potential reduction. This deadline to exercise its option was missed by nearly six months. That could have been considered an unexcused "default," or it could have been perceived by SGI as a volitational act not to pursue any such reduction. Delaware law recognizes a waiver of right can be accomplished either by an explicit writing or implicitly by knowingly not acting on requirements to attain or act upon a right. SGI was entitled to the benefit of its bargain, that absent material changes that might have taken place before or around the time delivery of the Gross Profit Statement was to be delivered (but, in fact, did not), it could assess its total and final obligations regarding an ultimate purchase price provided to it under the SPA. Sheakley cannot complain about the outcome of the train leaving the station when it did not buy a ticket or get on the train.

(*Id.* at PageID 22.) The Court cannot conclude that the Majority's analysis was in manifest disregard of Delaware law on this record.

### D. Wavier/Forfeiture

Finally, Sheakley argues that the Majority manifestly disregarded Delaware law disfavoring forfeitures or waiver of contract rights because Section 8.1 of the Purchase

12

Agreement ("Amendment and Waiver") constituted an express "no waiver" provision. Section 8.1 states:

> <u>Amendment and Waiver</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and each Seller (and, with respect to any amendment of <u>Section 2.7</u> of this Agreement, any Senior Lender). No waiver of any term of this Agreement or any default or breach thereof shall be valid unless the same shall be in writing and signed by the Party against which such waiver is to be enforced. No waiver by any Party of any default, breach of representation or warranty or breach of covenant hereunder, whether intentional or not, shall be deemed to extend to any other, prior or subsequent default or breach or affect in any way any rights arising by virtue of any other, prior or subsequent such occurrence.

(Doc. 1-2 at PageID 92.) The Majority found that generally, "such clauses protect against inadvertent waivers of rights or against waivers based on prior or subsequent forbearance by a party holding a contractual right which chooses to not seek to enforce its contractual right without the losing the ability to enforce it in the future." (Doc. 1-1 at PageID 17.) In this case:

> [U]nder the SPA's terms, Sheakley was entitled to seek a purchase price reduction, "if any," and, prior thereto, SGI was entitled to receipt of a Gross Profit Statement within sixty days after the Post-Closing Adjustment Termination Date. SGI was also entitled to timely receipt of the scheduled installment payments of the purchase price. SGI did not sign any written "waiver" of its rights to these terms of the SPA (i.e. timely receipt of the Statement and receipt of installment payments as scheduled) so as to abandon or forfeit such rights. And it could fairly have concluded that Sheakley had determined that no purchase price reduction in its favor was warranted since Sheakley did not perform the requisite steps to prove any reduction. Hence, the absence of a written waiver (by Sheakley, regarding its option to seek a price reduction, or by SGI of its rights to both timely receive the Statement and timely receive the installment payments) does not protect Sheakley as much as it would or might protect SGI on the undisputed facts in this arbitration.

(Doc. 1-1 at PageID 17–18.) The Majority considered three Delaware cases regarding delay in seeking a contractual price adjustment and whether the parties waived their rights. (Doc. 1-1 at PageID 18–20); *see Specialty DX Holdings v. Lab Corp of Am. Holdings*, No. N19C-06-054, 2021 WL 6327369, 2021 Del. Sup. LEXIS 726 (Del. Super. Ct. Dec. 16, 2021); *J&J Produce*

13

*Holdings, Inc. v. Benson Hill Fresh, LLC*, No. 2019-0599-JTL, 2020 Del. Ch. LEXIS 394 (Del. Ch. Ct. Mar. 11, 2020); *Schillinger Genetics, Inc. v. Benson Hill Seed, Inc.*, No. 2020-0260-MTZ, 2021 WL 320723, 2021 Del. Ch. LEXIS 19 (Del. Ch. Ct. Feb. 1, 2021).

In *Specialty DX*, the plaintiffs and defendant entered into an asset purchase agreement, where the main issue before the court was the defendant's delay in providing a proposed revised adjustment amount and whether the delay constituted a waiver. 2021 Del. Super. LEXIS 726, at *2. In evaluating the issue of waiver, the Court highlighted the "exacting" standard for proving waiver, which is a "voluntary and intentional relinquishment of a known right." *Id*. at *22 (citing *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus.*, Inc., 871 A.2d 428, 444 (Del. 2005)). The three elements to prove a waiver of a right under Delaware law are: (1) there is a requirement or condition to be waived; (2) the waiving party must know of the requirement or condition; and (3) the waiving party must intend to waive that requirement or condition. *Id*. (citing *AeroGlobal*, 871 A.2d at 444). "A waiver may be express or implied, but either way must be unequivocal." *Id*. (quoting *Bouchard v. Braidy Indust., Inc.*, 2020 Del. Ch. LEXIS 164, 2020 WL 2036601, at *8 (Del. Ch. Ct. April 28, 2020)). The court found the language of the asset purchase agreement to be unambiguous, placing the burden on the defendant to propose any revised adjustment amount "promptly" after a set date. *Id*. at *26. The court found that the defendant engaged in a prolonged and unreasonable pattern of delay with respect to its duties under the asset purchase agreement and did not propose a revised amount until nearly fifteen months later. *Id*. at *27. The court found defendant failed in its duty to provide information necessary for post-closing purchase price adjustments within the contractual period and waived its right to seek a revised adjustment amount in its favor. *Id*. at *30–31.

In *J&J Produce Holdings*, two parties entered into a stock purchase agreement, which

14

stated that within 90 days after the closing, the buyer "shall" prepare and deliver to the seller a closing statement. 2020 Del. Ch. LEXIS 394, at *4. The buyer never delivered the closing statement and thus breached the parties' agreement. *Id*. Rather than order the buyer to provide a five-month-late closing statement, the court determined the appropriate contractual remedy was to deem the buyer to have waived its right to a determination of a final adjustment amount. *Id*. at *5. In *Schillinger Genetics*, the parties entered into an asset purchase agreement and escrowed funds to secure the seller's obligations with respect to any post-closing price adjustment or indemnity claims. 2021 Del. Ch. LEXIS 19, at *1. The asset purchase agreement required the buyer to deliver a closing statement within 90 days of the closing prior to an adjustment. *Id*. at *5. The agreement did not specify what should happen in the buyer failed to timely deliver a closing statement. *Id*. The buyer failed to timely deliver the requisite closing statement, and after much prodding by the seller, the buyer submitted the closing statement nearly two months late. *Id*. at *2. The court relied upon *J&J Produce*, and found that the same logic applied, such that by submitting the late closing statement, the defendant forfeited its right to a post-closing adjustment determination of the final adjustment amount, and so the final adjustment. *Id*. at *38–39. To hold otherwise would reward the defendant for its breach where the closing statement seeks adjustment in its favor. *Id*. at *39.

The Majority considered the factual distinctions between this case and the aforementioned cases but found that they did not warrant a determination in Sheakley's favor. (Doc. 1-1 at PageID 19.) The Majority noted that it is correct that SGI never prodded Sheakley to provide a Gross Profit Statement, for instance, but found that it had no obligation to do so, as the option to request a price reduction only went in one direction, to favor Shakely if enacted. In *J&J Produce* and *Schillinger Genetics*, for instance, the adjustments could have favored either

15

party, which made the incentives different. (*Id.*) But here, "SGI had no obligation, nor any interest, to prompt such a submission itself." (*Id.*) Rather, Sheakley's knowledge of the SPA terms, its own internal reminders and its awareness that the business had significantly underperformed in its first year of acquisition should have placed Sheakley on notice of the timeline for preparing and submitting a Gross Profit Statement. Sheakley did not observe the deadline, seek an extension of time, or indicate that delivery would be late or attempt to reserve its rights in any way. (*Id.*)

The Majority considered and applied waiver law in the context in a delay in meeting contractual terms in a price-adjustment scenarios. None of the cases have the exact same pattern as this case, but the Majority found them to be analogous and supportive of its finding that Sheakley waived or forfeited its rights to a Gross Profit Purchase Price Reduction. Sheakley has not demonstrated that finding was in manifest disregard of Delaware law.

## IV. CONCLUSION

The Court is guided by the very high deference afforded to an arbitration decision where the parties consent to arbitration of a dispute as they did in this case. On matters of contract interpretation, this Court is not empowered to second-guess the arbitrators' informed judgment. Again, an arbitrator's "mere error in interpretation or application of the law is insufficient" to satisfy the very limited "manifest disregard of the law" standard of review. *Merrill Lynch*, 70 F.3d at 421. Here, Sheakley certainly disagrees with the Majority's interpretation of the law, but it has not demonstrated that the Majority manifestly disregarded the law in reaching its

conclusions.  Bearing in mind this incredibly narrow standard of review, Sheakley's Motion to Vacate (Docs. 19, 23) is **DENIED, and the Court CONFIRMS the Final Partial Award and the Final Award.   The Court, therefore, terminates this case from the docket of this Court.**

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge
